IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| STEWART ABRAMSON on behalf of himself and others similarly situated, | : : : | |
| Plaintiff, | : : | Case No. 3:16-cv-02079-JAM |
| v. | : : : : | |
| TRAVELERS PROPERTY CASUALTY CORP. and QUINSTREET, INC. | : : : | |
| Defendants. | : | |
| _____/ | | |

## FIRST AMENDED CLASS ACTION COMPLAINT

**Preliminary Statement**

1. Plaintiff Stewart Abramson ("Plaintiff" or "Mr. Abramson") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

2. In violation of the TCPA, Travelers Property Casualty Corp. ("Travelers") used a vendor to send automated robocalls for the purposes of advertising their goods and services to cellular telephone numbers, including the cellular telephone number of Mr. Abramson.

3. The vendor was the co-defendant Quinstreet, Inc., a California company specializing in insurance leads that has a contractual relationship with Travelers.

4. Mr. Abramson never consented to receive the call, and it was placed to him for telemarketing purposes. Because telemarketing campaigns generally place calls to hundreds of

thousands or even millions of potential customers *en masse*, Mr. Abramson brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Travelers and Quinstreet.

5. A class action is the best means of obtaining redress for Travelers and Quinstreet's wide scale illegal telemarketing, and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## Parties

6. Plaintiff Stewart Abramson is a resident of the state of Pennsylvania.

7. Defendant Travelers Property Casualty Corp. is a Connecticut corporation that has its principal office in this District and a registered agent of Corporation Service Company, 50 Weston St., Hartford, CT 06120.

8. Defendant Quinstreet, Inc. is a Delaware corporation with its principal place of business in Foster City, CA and a registered agent of Corporation Service Company, 2710 Gateway Oaks Dr., Suite 150N, Sacramento, CA 95833.

## Jurisdiction & Venue

9. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("hereinafter referred to as CAFA"), codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000.00, in the aggregate, exclusive of interest and costs, as each member of the proposed Class of at least tens of thousands is entitled to up to $1,500.00 in statutory damages for each call that has violated the TCPA. Further, Plaintiff alleges a national class, which will result in at least one Class member from a different state.

10. The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

11. Venue is proper pursuant to 28 U.S.C. § 1391 (b)(1) because the Defendant is a resident of this district. Venue is also proper pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to the claim occurred when Travelers made, or commissioned, the telemarketing calls that gave rise to the Plaintiff's claims.

## TCPA Background

12. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

13. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides a private cause of action to persons who receive such calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

14. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

15. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations*

*Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

16. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

## Factual Allegations

17. Mr. Abramson is a "person" as defined by 47 U.S.C. § 153(39).

18. Travelers engages in telemarketing through vendors to obtain new customers and sell insurance policies.

19. The telemarketing done by the vendors is a two-step process. First, the vendor is commissioned by Travelers to place an automated telemarketing call.

20. Second, after the call is connected with a potential new customer a few screening questions are asked based on criteria that Travelers provides, and then the prospect is transferred directly to a Travelers telemarketing specialist who attempts to complete the sale of the Travelers policy.

21. This is what occurred with Mr. Abramson.

22. The vendor who worked with Travelers is the co-defendant Quinstreet.

4

23. On October 18, 2016, Mr. Abramson received an automated call to a telephone number assigned to a cellular service, (412)-362-XXXX.

24. The caller ID associated with the call that Mr. Abramson received was (607) 428-8694.

25. On October 18, 2016, this was a non-working telephone number. As such, upon information and belief, the Quinstreet telemarketing campaign relies on fabricated Caller ID numbers to obfuscate the identity of the calling party.

26. The following facts indicate the call was placed through an "automatic telephone dialing system" as defined in 47 U.S.C. § 227(a)(1):

   a. The geographic location between the Plaintiff and the Defendant indicates that the calling was done through a nationwide *en masse* telemarketing campaign;

   b. Mr. Abramson answered the call and said "Hello" several times, and then he heard a distinctive click and pause, and then finally a live operator came on the line;

   c. Mr. Abramson contacted Travelers after receiving the automated telemarketing call, and Travelers did not deny that the call came from an ATDS.

27. After the automated call was received from Quinstreet, Mr. Abramson was transferred to "Nichole" with Travelers Insurance, and was given the phone number of (866) 360-0588 to call back if the call got disconnected.

28. The (866) 360-0588 phone number is a phone number for Travelers Insurance.

29. "Nichole" then continued marketing Travelers goods and services, and sent Mr. Abramson a quote.

30. A copy of that quote is attached as Exhibit 1.

31.     The Plaintiff was harmed by these calls because they were unwelcome intrusions on his privacy that occupied his telephone line from legitimate communications.

32.     Mr. Abramson wrote to Travelers asking if it had any evidence of his consent to receive the unwanted call at issue. Travelers responded but did not claim to have any documents that evidenced Mr. Abramson's consent to receive the telemarketing call at issue.

33.     Mr. Abramson also contacted Travelers to request the name and address of the vendor that Travelers used to contact him, but Travelers did not provide that information.

34.     Instead, only after his Complaint was filed did Travelers provide that information, which is the co-defendant Quinstreet.

### Travelers' Liability for the Telemarketing Call

35.     Travelers is a "person," as defined by 47 U.S.C. § 153(39).

36.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

37.     In their January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

38.     On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers such as Travelers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside

> the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

39. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

40. The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

41. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 CC Rcd at 6592 (¶ 46).

7

42. Travelers is legally responsible for ensuring that Quinstreet complied with the TCPA, even if Travelers did not itself make the calls.

43. Travelers knowingly and actively accepted business that originated through the illegal telemarketing calls from Quinstreet.

44. By hiring a company to make calls on its behalf, Travelers "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

45. Similarly, by accepting these contacts, the company that Travelers hired "manifest[ed] assent or otherwise consent[ed] . . . to act" on behalf of Travelers, as described in the Restatement (Third) of Agency. As such, Quinstreet is an agent of Travelers.

46. Moreover, Travelers maintained interim control over Quinstreet's actions.

47. For example, Travelers had absolute control over whether, and under what circumstances, it could issue a quote to a prospective customer.

48. Furthermore, Travelers had day-to-day control over Quinstreet's actions, including the ability to prohibit it from using an ATDS to contact potential customers of Travelers. Travelers failed to make such an instruction to Quinstreet, and as a result, is liable for Quinstreet's conduct.

49. Additionally, Travelers required Quinstreet to access Travelers phone systems and automatically transfer the Plaintiff and putative class members to their phone system for an immediate sales pitch from Travelers, which occurred during the illegal call.

50. Travelers also gave interim instructions to Quinstreet by providing (1) geographic parameters for potential customers that Quinstreet could telemarket to; (2) the volume of calling

and leads it would purchase; and (3) the timing that Travelers telemarketing personnel would be available to field the transfer of a prospect.

51.     Upon information and belief, because the telemarketing call was transferred directly to Travelers to attempt to complete the sale, Travelers worked with Quinstreet on the script it would use for the telemarketing calls, and provided interim instructions and changes to that script.

52.     As a result, Travelers not only controlled the result of the work, but also the means by which is was accomplished through interim instructions.

53.     Quinstreet transferred customer information, including the Plaintiff's information, directly to Travelers.  Thus, the company that Travelers hired has the "ability . . . to enter consumer information into the seller's sales or customer systems," as discussed in the May 2013 FCC Ruling.  As such, the company that Travelers hired is an apparent agent of Travelers.

54.     Travelers is also directly liable for the telemarketing call because it:

  i. actively participated in those calls through the guidelines it required Quinstreet to follow; and it
  ii. issued quotations and applications wholly derived from the telemarketing calls, as it did with the Plaintiff.

55.     Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46).  Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

**Class Action Allegations**

56. As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

57. The class of persons Plaintiff proposes to represent is tentatively defined as:

> All persons within the United States who received a non-emergency telephone call from Defendants, or any third party acting on its behalf, to any telephone number assigned to a cellular service through the use of an automatic telephone dialing system or an artificial or prerecorded voice at any time four years prior to the filing of the Complaint through the date of certification.

58. Excluded from the class are Defendants, and any entities in which Defendants have a controlling interest, Defendants' agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

59. The class as defined above is identifiable through phone records and phone number databases.

60. The potential class members number at least in the thousands. Individual joinder of these persons is impracticable.

61. Plaintiff is a member of the class.

62. There are questions of law and fact common to Plaintiff and to the proposed classes, including but not limited to the following:

    a. Whether Defendants violated the TCPA by calling individuals on cellular telephone numbers with an ATDS;

    b. Whether Defendants placed calls without obtaining the recipients' prior consent for the call;

    c. Whether the Plaintiff and the class members are entitled to statutory damages because of Defendants' actions.

63. Plaintiff's claims are typical of the claims of class members, as he too got a call by, or on behalf of, the Defendants on his cellular telephone using an ATDS.

64. Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the class, he will fairly and adequately protect the interests of the class, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

65. The actions of Defendants are generally applicable to the class and to Plaintiff.

66. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendant and/or its agents.

67. The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

68. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

**Legal Claims**

**Count One:
Violation of the TCPA**

69. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

70. The foregoing acts and omissions of Travelers and Quinstreet constitute violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq.*

71. As a result of Travelers and Quinstreet's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Class members are entitled to an award of $500 in statutory damages for each and every call in violation of the statute, which may be trebled to $1,500, pursuant to 47 U.S.C. § 227(b)(3)(B).

72. Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Travelers and Quinstreet's violation of the TCPA in the future.

### Relief Sought

For himself and all class members, Plaintiff requests the following relief:

A. Injunctive relief prohibiting the use of an ATDS by Travelers;

B. Because of Travelers' willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiff seek for herself and each Class member treble damages, as provided by statute, of up to $1,500 for every call that violated the TCPA;

C. An award of attorneys' fees and costs to counsel for Plaintiff and the Class;

D. An order certifying this action to be a proper class action under Federal Rule of Civil Procedure 23, establishing any appropriate Classes the Court deems appropriate, finding that Plaintiff are a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

E. Such other relief as the Court deems just and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

PLAINTIFF,
By his attorneys

*/s/ Matthew P. McCue*
Matthew P. McCue
The Law Office of Matthew P. McCue

        1 South Avenue, Suite 3
        Natick, Massachusetts 01760
        (508) 655-1415
        mmccue@massattorneys.net